Thank you, Your Honor. May it please the Court, Mark Haddad, Sidley Austin for W. Scott Harkonen. Your Honor, we live in the information age. This was Congress's core recognition that underlay its adoption of the Information Quality Act. It recognized the tremendous power that the Internet creates to disseminate information and also the potential for harm that that rapid dissemination can create when the sources of information or the information itself are not reliable. And it realized that federal government agencies, no less than other sources of information, may disseminate information that is not accurate and that in fact can cause harm to persons. And it required agencies in the Information Quality Act to adopt mechanisms so that affected persons can seek and obtain a correction of such information. And failing to obtain the correction that they seek, does the statute further provide them a private cause of action? That's the question we've got in front of us. Yes, Your Honor. The answer to your question is that the Administrative Procedure Act provides that cause of action, as it does for many statutes where Congress does not expressly state that there is a cause of action under the statute itself. We've cited, for example, the statute that provides for the correction of military records. That provides that administrative the branches of the military service will provide a mechanism for individuals to correct their military records and that the Secretary may correct those records when appropriate. Is your client seeking merely a reissuance of the press release as corrected in the way that he thinks it ought to be corrected, or is he seeking damages in addition? He is not seeking damages. He just wants a new press release? He wants either a new press release or other corrective action as appropriate to clarify the misrepresentation about what his conviction is based on. The Secretary, we acknowledge, has some discretion in choosing the appropriate correction. But where there is information is false, there must be a correction. Are you abandoning any claim that you actually, your client actually has a cause of action under the Act? And are you limiting your claim under the Administrative Procedure Act? That's correct. I don't, I think we have always pressed this as an APA claim. And we think it's clear under the APA precedent that this statute amply provides the kind of meaningful standards that allow a court to evaluate here, for example, whether the Justice Department is acting consistently with the plain language of the statute. The IQA says that there has to be a mechanism to create, to obtain a correction when information disseminated is not, for example, objective. And yet the Department here has said that its usual method, its usual method of disseminating information to the public is categorically exempt from the IQA. I'm quoting there from Excerpts of Record 163, which I urge the Court to look at. The Justice Department is telling Dr. Harkinen in taking the position that its usual method of distributing information, disseminating information, is completely out of bounds for the IQA. Now, if that's correct, they've essentially declared themselves immune to requests for correction under the IQA for their usual means of communicating to the public. If that's correct, I submit that's extremely damaging to the integrity of the Department of Justice. It has ripple effects throughout the communications of media that turn on and rely on the Department of Justice's usual method of communicating, which is the press release. And so it's an extraordinary departure that just under the plain meaning of the IQA can't be accepted. And this is a straightforward statutory construction question that the D.C. Supreme Court has been trying to answer for a number of years, and it's a straightforward legal question of the kind courts answer all the time. I'm not sure I agree with you, but on the assumption that I do, let's talk about what is wrong or defamatory, or I'll say it this way when we try to be neutral, the passages in the press release to which your client objects. Number one, the results of the clinical trial, and number two, diverse and oppressive financial resources of the VA. Why are those incorrect? All right, Your Honor. Taking the first one, the press release says that Dr. Harkinen was convicted for manipulating scientific research and falsifying test results, and that this damages the foundation of the clinical trial process. Well, that's not quite right. No, what the press release says is Mr. Harkinen lied to the public about the results of a clinical trial and offered false hope to people stricken with a deadly disease, period. Manipulating scientific research and falsifying test results damages the foundation of the clinical trial process, undermines public trust in our system for drug approval. Well, the second sentence doesn't say that that's what he did. It implies, but it doesn't say. Are you saying that the second sentence says that he falsified test results? Yes, Your Honor. I think that's the only way to read that second sentence, as it is clarifying and amplifying what the first sentence means. That's the context. If they wanted to clarify and amplify, to do it correctly, they should have drawn the same distinction that they drew to the district court and to the jury, where they made clear that falsifying test results did not mean falsifying data. Well, but the argument might be, and I've heard it from the government, or rather read it from the government, I expect to hear it in a moment, that data, the numbers, is not the same thing or are not the same thing as results. And he clearly, at least as I read the record, lied about the significance of the data, that is to say, about the results. Yes, Your Honor. That's what he was convicted of, was the conclusion drawn from the results. But let me give an analogy. Well, so he falsified test results, meaning lied about the test results. No, Your Honor. It is an important distinction. Let me give an analogy that I think might be helpful. If a company controller is asked to report on the financial results of a company and he says the company was profitable over the last five years, and you look at the results and you conclude nobody could reasonably say this company was profitable, just look at the results. Well, that's culpable behavior. He didn't represent the results correctly. But it's a far different situation if that controller had actually falsified those financial results. If he'd changed the data, the company records, then he also would have falsified those results, but in a way that would be profoundly corrupting of the accounting system. So, which of the two happened in a particular case would be manifestly important to the reputation of that controller. The same thing is true here. No scientist would defend the falsifying of test results. The experts who came in at sentencing, who testified on Dr. Harkin's behalf at sentencing and prompted the district court to sentence Dr. Harkin and only to probation rather than the ten years that the government asked for, they would never have come in if this was a fight about falsifying test results. They were there because the fight in the district court was over conclusions to be drawn from test results. This is a critically important difference to Dr. Harkin's reputation. Well, you know, it does seem odd to me. I mean, we've got a criminal conviction that you're not challenging, and you're now challenging sort of a fine-grained analysis of a press release trying to rehabilitate his reputation. In a way, I don't quite get it. Your Honor — I mean, his reputation, I think, has probably been seriously damaged by the criminal conviction that you're not here challenging. Certainly it was. But, for example, if one looks at the consequences to one's medical license, it is a separate — apart from having a conviction for a fraud or a felony, it's a separate grounds for punishment if you have made false entries, if you've falsified records. That's a separate — that's separately culpable conduct. And as I say, no one can support or defend falsifying test results. And as we gave to the government in our submission — Well, the conviction compromises, to a certain extent, obviously, Dr. Harkin's reputation. But what was he guilty of? What was he convicted for? The government made clear — Wire fraud. Wire fraud. But not — That's pretty profound. It is. But look at it — let me suggest this. Dr. Harkin was convicted for a press release that overstated what the evidence of a clinical trial showed. That's the heart of his conviction. The Department of Justice is here trying to escape culpability for its press release, which overstated what the evidence in a jury trial showed. The evidence did not show falsifying test results. That's not an objective, accurate, fair representation of what the trial was about. It was solely about the conclusions that can be drawn from test results. The New England Medical Journal routinely breaks its articles down into the results and the analysis or discussion of the results. That is the way medical science looks at clinical trials. We submitted an example of this to the Department of Justice in our request. So the Department has a duty to make sure that the public is fairly informed of what goes on in the courtroom, is fairly informed of what an individual is or is not convicted of. And this distinction was profoundly important to what he was convicted of, but also the limits of it. This was an extraordinary prosecution. The court cannot find another prosecution like this one. And in the footnote 6, I believe, to the Ninth Circuit's decision on published upholding his conviction, they noted the strong expert evidence that came in in sentencing, not unfortunately at trial, but at sentencing, explaining and supporting why this conclusion was actually a reasonable one to draw. But that's not for this court. I mention that solely for this point, that this distinction, the one we're relying on here, is why those experts came in at sentencing, is why the trial court did not sentence Dr. Harkonnen to the degree of culpability that the government announced in this press release and that continues to be and was for two years in the Department of Justice. Mr. Hannon, this is Judge Newman. Could you tell us concretely what were the consequences of this statement by the government? What were the consequences for your client? When my client would try to respond to requests from friends, professional colleagues, those who might offer him employment, which was possible, notwithstanding his conviction, their view of what he did was shaped by the press release. It was the second or third we cited most frequently raised response to an Internet search of his name for over a year. So the public looking at him, their view was shaped by this misleading press release. And he has got to say, what credibility does an individual have against the press release of the government in describing what the real basis of his conviction was? I understand you were not claiming damages for the release. No real damages? We did not plead a case for damages, Judge Newman, because we don't we're not entitled to damages under the APA. But there was reputational harm and there were consequences for his ability to seek employment after his conviction. If the Court has no further questions, I'd like to save some time for rebuttal, although I would entertain questions if the Court prefers. Judge Newman, do you have any further questions at this time? No, thank you. Okay. Well, we'll make sure you have time for rebuttal. Thank you, Your Honor. May it please the Court, Melissa Patterson for the government. I think it's helpful to start out by understanding the principles relevant to agencies' release of information. And this does come up with some regularity. The government issues a lot of information, particularly health, public health and safety advisories and warnings, and often people don't like it. And often people say, well, this harmed us in some way. But it's very well established. Let's set the Information Quality Act to the side. Just under the APA, if an agency's release of information doesn't have a direct regulatory effect on you, doesn't fix some legal right or obligation or cause a legal consequence, no matter how much you don't like that information, even if it causes sort of downstream real-world effects on your business or your reputation, it's not the sort of final agency action that you can get in. So you're saying that the Department of Justice decides to issue a press release tomorrow saying that I'm entitled to information, I'm a sex offender, I have no way to enforce in court, that you issue some sort of a correction? Yes, Your Honor. I think that's pretty extreme. Your Honor, there's, remember, there's never been that sort of APA right, a final agency action. Now, the D.C. No, but you're saying the DOJ can, without any threat of legal correction by a court, issue something that is blatantly false and defamatory about any citizen of the United States? Your Honor, I think the D.C. Circuit has, one, that is very far afield from what we have, and the D.C. Circuit has suggested that if you had that kind of situation where an agency was using an information release as a sanction, then maybe you would be able to get in under the APA, because, of course, sanction is a type of defined agency action. But the D.C. Circuit has never actually, that has never been the case, because, of course, that's not what the government does, and that's certainly not what the government did here. So you're saying, trust, we're from the government, trust us? I am saying that there is no APA right to sue us on the basis of a press release. And, again, let's return to the background principle, because people do, often industries do not like the government's information, and the result of finding that the information is enacted as a note to the Paperwork Reduction Act creates, bestows that type of statutory right. Remember, we don't have an allegation of an invasion of the sort of, I think, background rights maybe you're talking about in your hypothetical. What's alleged here is an invasion of a right allegedly bestowed by the Information Quality Act. I think appellant's position here is that that, those rights there, that's what gets them in under the APA. And if you look at the language of the Information Quality Act, it doesn't do that. It doesn't say there's going to be a review procedure and people can come in and challenge it in court. It says, OMB, you need to issue some policy or procedural guidance, and we want that guidance to include certain things, including an administrative review mechanism. And remember, the way that's policed is through OMB. Agencies have to compile the sort of request for corrections they get through this administrative procedure, let OMB know what their responses are, and then report back to the Office of Management and Budget. And if the Office of Management and Budget thinks that you are not living up to your duty to ensure that information is of sufficient quality, objectivity, utility, and integrity, then the OMB can take action. But I want to make sure that the court is aware of the consequences of all of a sudden saying the Information Quality Act gives you a right to sue under the EPA. If you look at the cases like the flu-cured tobacco case cited in our brief, their tobacco industry did not like a report classifying tobacco smoke as a carcinogen, and they wanted a correction of that information. They wanted the EPA to redo the study. The consequences of appellant's position here is that by virtue of filing a petition for correction, that the denial of that petition to correct the EPA study would give them the sort of final agency action that means that courts would be deciding those questions of how objective was your study, how useful, what utility is your study. Other examples include the FAA issues these service difficulty reports about aircraft parts. And then the Third Circuit in the aerospace case said it doesn't actually fix your legal right, it's just issuing a correction advisory, there might be a problem with your part, so that's not final agency action. The result that appellants would have is that by the simple expedient of filing a request for correction, those plaintiffs could get into court, could enmesh courts in those types of questions. And as the Fourth Circuit explained, and I think it's worth quoting here, under that case... Sotomayor Is there some reason you're quoting the Fourth Circuit today? I think the Fourth Circuit was... Well, there are a couple reasons, and it's not simply by Judge Davis's presence. One, they're making a lot of sense here, so let me just quote what they're saying. I'll report back. That by virtue of this idea that because the agency's information is faulty in some way and you don't like it, you get to sue under the EPA, that would render almost any policy or publication issued by the government subject to judicial review. The Fourth Circuit did not think that Congress intended to, quote, create private rights of actions to challenge the inevitable objectionable impressions created whenever controversial research by a federal agency is published. Now, the second reason I'm quoting the Fourth Circuit is that to agree with appellants, you'd have to go into direct conflict with the Fourth Circuit. So I think it's helpful if I actually turn to it so we can quote it. The Fourth Circuit squarely held that the Information Quality Act does not confer the sort of legal right that allows you to sue under the EPA by virtue of an alleged Information Quality Act violation. Now, I believe the only response to our invocation of the Fourth Circuit's square holding on that point is a claim that really the Fourth Circuit did not reach that question because the government had argued it didn't need to. It is true that the government thought that the Fourth Circuit didn't need to actually reach that question. We thought the request there only sought the disclosure of information, not the correction. The other side strenuously objected to that characterization of their complaint. They said, no, no, we want a correction under the Information Quality Act. And they queued up, as the issue presented, is there judicial review under the APA by virtue of a violation of the Information Quality Act? And that is the court, that is the question the Fourth Circuit decided there. So they disagreed with us about what the issue was, but they agreed with us about the resolution of that issue and squarely held that there's no legal right to information or its correctness bestowed by the Information Quality Act. You know, but to come to the second question, assuming now that I disagree with you on this point, well, I guess that doesn't matter whether we do or not, I just want to move on to whether or not the government may be judicially compelled to correct a press release, or whether the government, just because it's acting as good government, should correct an inaccurate press release. I have to say I'm somewhat sympathetic to Dr. Hockennan when the government says he lied about the Fourth Circuit's results and he falsified test results, because I kind of agree that the second sentence, although it doesn't directly state that he falsified, the strong implication, of course, in the second sentence and the two-second paragraph, is that he falsified test results. It's just a matter of another press release for the government to issue a press release to say he did not falsify data. On the other hand, he lied about the significance of the results, and we nailed the guy. Why couldn't you just do that? Well, Your Honor, we don't think there's anything inaccurate in the press release. Well, let me tell you that I think there is something at least misleading. Whether actionably inaccurate is a different question. But misleading, it seems to me, and I'm just speaking for myself, it seems to me that you've issued a misleading press release. So why don't you just go back and correct it? Your Honor, if we had thought it was misleading, we would have corrected it. And you still don't think it's misleading based on what you've heard here? No, Your Honor. Falsifying test results suggests strongly to me we're falsifying the numbers, not merely mischaracterizing the consequence of the numbers. Well, let me try to persuade you that that is not the natural reading of the word results in this context. What if that's the natural reading for many people reading the press release, whether you think so or not? Well, Your Honor, I don't know that in the course of correcting, even assuming this is judicially reviewable, even assuming it's not committed to agency discretion, that DOJ has to conduct some sort of population survey about how people responded to this. I don't think you need a survey. All you need to do is understand English. Well, Your Honor, let me try to persuade you that this was a very natural use of the word results. When we talked about results, we said nothing about data, nothing about numbers. But you said something about falsifying. Now, falsifying suggests there is something hard, quantifiable, rather than mischaracterizing or misinterpreting. You said falsifying. Your Honor, I think the word falsifying can naturally be used to apply to both the analysis as well as the data. If you look at this Court's affirmance of Dr. Harkonnen's conviction, it uses the word results to talk about the analysis multiple times, not just once, not just describing the witness testimony, which I think was their response. It talks about he was looking for a positive result. If you lie about the positive result, you're falsifying the result, you're falsifying the outcome. And I think that this sort of insistence that results means the same thing as data is just wrong. And if you look at the... I think results freestanding doesn't mean the same thing as data, but as soon as you say falsifying instead of mischaracterizing, that's when I start thinking, wait a minute, they may be talking about something that sounds to me as though they're talking about something that's quantifiable, rather than we're talking about characterization of something that's quantifiable. Well, Your Honor, I think this discussion, this, you know, I see it this way, I see it this way, just goes to show... So if I could just make two points about this, just goes to show the sort of redlining of agency reports, of agency information disseminations that would happen if we suddenly create an APA right to review those things, agency statements that don't have legal consequence. Second, remember, if we're in the world where we're reviewing this under the APA, it's under the APA standards of review, and it would be arbitrary and capricious. So you don't just have to think you could have issued a better press release. You have to think it was arbitrary and capricious for the Department of Justice to stick with its original meaning and say, well, we think falsifying test results is read as falsifying the analysis when you said in your tagline it reduces mortality rates by 70%. That was the kind of extrapolation from the data we were talking about. That was what Dr. Harkonnen was convicted of, and that is what we think is reflected in this press release. I wanted to ask you a question about another statement in the release. You know, what about the statement, the actions of the defendant served to divert precious financial resources for the VA's critical mission of providing health care to this nation's ordinary veterans? Is that a true statement? Yes, Your Honor, that is accurate. And it's accurate in a couple ways. There was a diversion of resources in several different ways. First, of course, at the time this press release was issued, on the day the jury verdict came down, we intended to show that Dr. Harkonnen's fraud had caused loss, that it had made people buy this drug who otherwise wouldn't have, including the VA. Now, the district court at sentencing, which happened the next, I believe, year, disagreed that we had met our burden of preponderance, or whatever the standard was, we had failed to meet it. We were proceeding on a statistical analysis related to what we said was a spike in sales after the press release, and Judge Wilkin disagreed that that was an appropriate way to issue a sentencing enhancement and said, well, I don't know in any individual case why the doctor prescribed. So we don't think that that shows that there wasn't any diversion of resources. We think that that shows we didn't meet our preponderance to satisfy loss. And it's accurate in a second way, and this was also issued in the Department of Justice response to Dr. Harkonnen's request, which is that whenever there's this sort of fraud, and in context the statement refers to the complex and labor-intensive investigation and trial that resulted from this fraud, there's a diversion of resources from that. This claim that the VA Office of the Inspector General doesn't further the healthcare mission, I think, is wrongheaded. OIG, the IG has, for example, an Office of Healthcare Inspections that makes sure that the care provided to the nation's veterans is of sufficient quality. And moreover, whenever an IG conducts an investigation, of course the agency for which it's the IG has to cooperate. So for all of those reasons, we think it's accurate now as it was then to say that there was a diversion of resources due to Dr. Harkonnen's fraud. If there are no further questions, we'd ask this Court to affirm. Okay. Judge Noonan, do you have any further questions at this time? No, thank you. Okay. Thank you very much. We took you down to about 35 seconds. Why don't we put two minutes on the clock for you? Thank you very much, Judge Fletcher. I think I can get to four points. One is the request for correction. And Barber v. Widnall in the service records context, I think, is the best analogy. The primetime case to which the government does not have a compelling response also is clearly the case on point for whether there's judicial review on the merits here. And it's similar to the Americans for Safe Access case, which is this Circuit's decision. Neither of those courts accepted the grounds for decision that the District Court gave. Each time this has come up in the Court of Appeals on this Salt Institute argument, which the District Courts accepted, the Courts of Appeals have not accepted the Fourth Circuit's standing analysis. And the D.C. Circuit went out of its way to do two things. One, it accepted an argument raised for the first time on appeal on the IQA. And then at the very end of its opinion, it says, making clear, we are affirming dismissal of the IQA claim, but on different grounds than the District Court. And what the District Court had done was follow Salt Institute, the way the government suggests. Salt Institute does not address the request and obtain correction language. It just doesn't have the IQA analysis in it, and it should be considered dicta. But if you don't consider dicta, then the Court should reject it. The government's defense of the merits of the press release reminds me a lot of Dr. Arkinon's arguments about why his press release wasn't misleading. The press release is misleading in the ways we suggest. And the Ninth Circuit, in its opinion, made the acknowledgment that the government refuses to make, which is that the press release, even if not literally false, could be misleading. And that's what the Ninth Circuit said. Finally, on the final claim of misleading regarding the VA, just briefly, Judge Patel gave the government the opportunity to claim restitution. And the government admitted it had no basis to claim restitution in this case. The government did not look for Veterans Administration documents until sentencing. We know that because they didn't give us the VA documents until sentencing, and we filed a Brady motion on that basis. Those documents would have been helpful to us at trial on materiality. The Brady motion was denied, but the fact that we didn't get VA documents shows that at the time the government made this statement, it didn't have evidence of a diversion. But here you've got to prove falsity rather than what they proved at trial. And at sentencing, they had no evidence of diversion. They couldn't show a single prescription written by the VA. All they had... It is not sufficient to carry that burden to show lack of proof at the criminal trial. But I think it is sufficient to show lack of proof at sentencing, a lack of any support. That at least renders it misleading. They don't say in the press release, we intend to show he diverted resources. They say he did it. They didn't prove it at trial, and they didn't prove it at sentencing. That's misleading. Thank you.
judges: Davis, Noonan, Fletcher